IN RE GUARDIANSHIP OF KUESCHEL: WEISNICHT and another, Appellants, vs. KUESCHEL and another, Respondents.

*September 16—October 13, 1942.*

For the appellants there was a brief by *Winter & Koehler* of Shawano, and oral argument by *P. J. Winter.*

For the respondents there was a brief by *Eberlein & Eberlein* of Shawano, and oral argument by *M. G. Eberlein.*

MARTIN, J. Alfred Kueschel, husband of Margaret Kueschel and father of Fritzie and Wilfred Kueschel, died

intestate August 31, 1919, leaving surviving his widow and the two children, his only heirs at law and next of kin. His estate was administered in the county court of Shawano county. The appellant Rollman was the administrator. During the progress of the administration the administrator petitioned the court for license to sell or mortgage the real estate to pay debts against the deceased. It is stated in the petition that the debts outstanding amounted to $6,200; that the amount of personal estate which had come into the hands of the administrator was $2,870. The petition further stated that it would be inadvisable to sell the personal property as it consisted almost entirely of farm machinery, livestock, etc., all of which was necessary on the farm to produce an income. In these proceedings a guardian *ad litem* was appointed and appeared for the two minor children.

On October 19, 1920, the court entered an order authorizing the administrator to mortgage all or so much of the real estate as might be necessary for the payment of debts. By the terms of said order the court found that the personal estate of the deceased was insufficient to pay the debts, and that it would be inimicable to the interest of the estate to sell the personal property. The real estate consisted of an eighty-acre farm, fifty-three acres of which were under cultivation. It was equipped with the usual farm buildings which at the time were in good condition.

It appears that Alfred Kueschel's death was due to a railroad accident; that his widow brought an action against the director general of railroads for the wrongful death of her husband under the federal Employers' Liability Act. The case was settled for $2,500, leaving the widow net out of the proceeds of the settlement $1,962.68. Judgment allowing the administrator's final account and assigning the estate was entered August 10, 1921. The final account showed personal estate on hand at the appraised value of $2,825. It also showed that the administrator had on hand the $1,962.68 net

proceeds of the settlement of the case against the director general of railroads. This item was assigned to the widow; it belonged to her under the federal law. The personal property was assigned one third to the widow and one third to each of the children. The real estate was assigned to the two children, each an undivided one half, subject to the dower and homestead rights of the widow. The mother was appointed general guardian on September 10, 1921.

Upon entry of the judgment allowing the administrator's final account and assigning the estate, the mother as general guardian gave her receipt to the administrator acknowledging receipt of the one-third interest of each child, his interest being in the sum of $941.67, on the basis of the appraised value of said personal property. On November 12, 1925, the mother as general guardian petitioned the county court for authority to sell the interest of the children in the real estate, that is, the eighty acres subject to the homestead and dower rights of the mother. An order was entered appointing appellant J. L. Rollman as special guardian of the two children in relation to the proceedings on the application for sale of their interest. The order directed the special guardian to furnish a bond in the sum of $3,500, which he furnished, and also directed the special guardian to report to the court any agreement entered into by him for a sale of the children's interest in the real estate.

It appears that on the same date the special guardian entered into an agreement with the mother in her individual capacity, whereby it was agreed that Rollman as special guardian sell to the mother all the right, title, and interest of said children in the real estate, subject to her homestead and dower rights, also subject to the then incumbrances in the sum of $5,457.32, for a consideration of $3,400 to be paid by the mother to the special guardian in the form of a note in said sum due in five years with interest at five per cent per annum, said note to be secured by a real-estate mortgage in

like amount. Rollman as special guardian reported to the court the agreement as made with the mother. It appears that some evidence was taken as to the necessity and advisability of the sale, whereupon the court in all respects confirmed the guardian's report and agreement of sale, and directed the execution and delivery of a deed. It appears that on December 9, 1925, Rollman as special guardian assigned the $3,400 note and mortgage to the mother as general guardian of the persons and estate of the two children, and the mother as general guardian receipted to Rollman as special guardian for the $3,400 note and mortgage.

The general guardian filed annual accounts covering the period from the time of her appointment down to and including 1934. The guardian's first account, which covers the period from September 10 to December 31, 1921, shows personal property on hand, belonging to her wards, at an appraised value of $1,883.33, this being the only debit item for that period. This court will not attempt to restate the guardian's account because additional evidence and findings are required. We will make only general reference to what we consider to be proper items of debit and credit.

The trial court dealt with the issues in two divisions, the first relating to the $3,400 note and mortgage, and the second relating to the items of interest and taxes for which the guardian took credit in her annual accounts by deducting same from the personal property on hand belonging to the wards.

None of the parties seek to have the special-guardian sale of the interest of the minors in the real estate set aside. Appellants contend that the sale having been confirmed by the court, and no appeal having been taken from the order directing that the sale be consummated, it is now conclusive in the absence of fraud. On the other hand, respondents contend that the general guardian having purchased the interest of

her wards in the real estate, even though she did so in her individual capacity, she must account to the wards' estate for the $3,400 as cash. The trial court refused to surcharge the general guardian's account with this item of $3,400 as cash. In that connection the court said:

"Counsel for the wards has invoked the Massachusetts rule as to fiduciaries who are indebted to the estates which they are handling. As applied to guardians, the rule appears to be that a guardian becomes personally responsible for the value of property received by him and receipted for as cash. This does not seem to me to be such a case. It seems to be abundantly evident throughout the whole proceeding and this is evidenced by the receipt given by the guardian and by her annual reports that she always treated the mortgage which she received as a mortgage, and not as cash. There is no attempt at concealment of this fact and it was known to all parties and to the court.

"I do not think she should be held strictly accountable for the mortgage and note given by her and this will not be surcharged in her accounts."

In *Estate of Howey*, 216 Wis. 94, 96, 256 N. W. 620, the court said:

"There is no doubt of the adherence in Wisconsin to the strict 'Massachusetts rule' that debts owing from the executor to the testator automatically become assets in the former's hands upon his acceptance of the executorship, and this regardless of the insolvency of the executor at the time of his acceptance or thereafter." Citing *Finch v. Houghton,* 19 Wis. *149; *Lynch v. Divan,* 66 Wis. 490, 29 N. W. 213; *Estate of Robinson v. Hodgkin,* 99 Wis. 327, 74 N. W. 791; *Will of Stubbs,* 213 Wis. 439, 250 N. W. 845.

Further, the court said:

"If it may be held that the bank acted as executor of deceased's estate, then any debt which it owed to deceased as a bank would, *ipso facto,* become a cash asset in its hands as executor. It would be obliged to turn over to appellant, as

succeeding representative, the cash representing the amount of indebtedness." To same effect see *Estate of Robinson v. Hodgkin, supra; Will of Stubbs, supra.*

Appellants argue that the Massachusetts rule, which has been adopted in this state, applies only to executors and administrators. We are of the view that it has equal application where the relationship and transaction are that of guardian and ward. The argument that the general guardian receipted to the special guardian for the $3,400 in the form of a note and mortgage is beside the point. It is the fact that the general guardian accepted as an asset of her wards' estate her individual note and mortgage that makes applicable the rule of the above cases, which requires that she account for the $3,400 as cash. The argument that it was a third mortgage on the property and that the interests of the minors as well as the homestead and dower rights of the mother would have been lost in any event on foreclosure of the first mortgage (which did happen) is also beside the point. The guardian's final account must be surcharged with this item of the $3,400 note and mortgage as cash.

It appears that at the time the administrator was authorized to mortgage the real estate a $4,200 mortgage was given to the Cecil State Bank and a second mortgage of $2,000 was given to a Mrs. Lambrecht. The proceeds of these two mortgages, with other moneys personally advanced by the widow, were used to pay the mortgages that were against the property at the time of Alfred Kueschel's death. It further appears that the widow at some later date borrowed $2,000 from her father-in-law, August Kueschel, the proceeds of which she used to pay the Lambrecht mortgage, which, like the former mortgages, was an incumbrance against the wards' interest in the real estate. Thereafter, August Kueschel, by his will, bequeathed his $2,000 mortgage to the widow Margaret Kueschel Weisnicht. Thus it appears that the widow per-

sonally contributed of her own funds at least $3,962.68, through refinancing during the administration of Alfred Kueschel's estate, to apply on indebtedness which her husband, Alfred Kueschel, owed at the time of his death. To the extent that the interest of the wards in the real estate was benefited by these payments, the widow as their general guardian is entitled to credit in her final account. It is obvious that a determination of the amount of such credit will require further proceedings in the trial court and definite findings as to the facts.

The guardian's first annual account shows that on September 3, 1921, she made a payment out of the proceeds of the moneys received in settlement of her case against the director general of railroads in the sum of $1,962.68 to apply on the first-mortgage lien against the eighty acres. Running through the annual accounts from 1921 to 1924, inclusive, there are many items of credit for taxes and interest paid. As to all these items, both taxes and interest should be apportioned to the respective interests in the real estate. The wards should be charged to the extent that their interests should bear in the items of taxes and interest, and the guardian should have credit accordingly.

From November 12, 1925, to and including 1934, there are no credits taken in the guardian's annual report for either taxes or interest paid because during all of said period the guardian was the sole owner of the real estate. It further appears that during the period from 1921 to 1924, inclusive, the guardian made no charge and took no credit for the board of her wards. During this period she took credit only for items of clothing, medicine, medical attention, and a few other sundry items. From November 1, 1925, to 1930, inclusive, the guardian takes credit in her annual reports for board of the wards at the rate of $10 each per month, and in each annual report covering the whole period the items of credit for board and the items for clothing, medicine, and medical

attention are deducted from the wards' interest in the personal property which the guardian debited herself in her first annual report for the year 1921, in the sum of $1,883.33.

Commencing with the annual report for the year 1925 and running through the reports of the subsequent years to and including 1934, the guardian has debited her account with the $3,400 note and mortgage. The annual report for the year 1925 also has a debit item of $969.85, designated balance of "interest in personal property on basis of valuation at time of assignment of estate." By reason of credits taken from 1926 to 1930, inclusive, the wards' interest in the personal property appears to have been exhausted.

Sec. 319.26, Stats., so far as here material, provides:

"Every guardian shall manage the estate of his ward frugally and without waste and apply the personal property or the income therefrom or from the real estate, as far as may be necessary for the suitable education, maintenance and support of the ward. . . . If the personal property and income from the real estate shall be insufficient for those purposes, the guardian may sell or mortgage the real estate, upon obtaining a license therefor, as provided," etc.

The trial court was of the view that when the guardian became personally indebted to her wards, thereafter instead of deducting items of credit from the appraised value of the personal property she should have credited herself with the amount of such items on the $3,400 note and mortgage. While that may be true, in view of our conclusion that her account must be surcharged with the $3,400 note and mortgage as cash on hand, it seems immaterial from which account the credits were deducted.

The court having held that the guardian was not chargeable with the $3,400 note and mortgage, concluded that her account should be surcharged with $1,607.88, being the amount of credits taken by the guardian subsequent to the date of the note and mortgage, for the board, clothing, medicine, etc.,

furnished the wards.  This item, plus $192.36, claimed to result from the miscalculation on interest and taxes, make up the $1,824, the amount of the surcharge against the guardian.  While it does not appear that any formal order was entered by the court fixing the amount which the guardian might charge her wards for board, it does appear without dispute that she did consult the court and was told she might make a charge against the wards of $10 each per month for their board.  There is no question about the reasonableness of the amount charged for board or for the other items of clothing, etc.  These items need not be further considered. The wards having an estate of their own, it is proper that their estate be charged with such items.

While we appreciate the fact that the record discloses a situation which points to an almost certainty that the wards and their guardian-mother were doomed to lose their farm on foreclosure of the first mortgage, that does not change the rule that the guardian must now account to her wards for the $3,400 note and mortgage as cash on hand belonging to her wards, less the credits to which reference has herein been made.

*By the Court.*—That part of the order entered on December 30, 1941, refusing to discharge the appellant J. L. Rollman as surety and directing the guardian to account, is affirmed. That part of the order with reference to the items for which the guardian's account should be surcharged is reversed, and cause remanded for further proceedings in accordance with this opinion.